IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

## STATE OF TENNESSEE v. JOSEPH THOMAS

**Appeal from the Criminal Court for Shelby County**
**No. 11-01736    James C. Beasley, Jr., Judge**

─────────────

**No. W2015-00157-CCA-R3-CD  -  Filed February 22, 2016**

─────────────

The defendant, Joseph Thomas, appeals his Shelby County Criminal Court jury convictions of aggravated robbery, aggravated assault, aggravated burglary, and employing a firearm during the commission of a dangerous felony, claiming that the trial court erred by denying his motion to dismiss for failure to prosecute and by instructing the jury on criminal responsibility, that the evidence was insufficient to sustain his convictions, and that the trial court erred by classifying the defendant as a career offender. We affirm the convictions and sentences but remand for correction of a clerical error in one of the judgments.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Mitchell Wood, Memphis, Tennessee (on appeal); and Jake Erwin, Memphis, Tennessee (at trial), for the appellant, Joseph Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree and Josh Corman, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In March 2011, the Shelby County Criminal Court grand jury charged the defendant with one count each of aggravated robbery, aggravated assault, aggravated burglary, and employing a firearm during the commission of a dangerous felony, arising out of the home invasion of the residence of Sheila Clemmons and Antonio Wheeler. The trial court conducted a jury trial in December 2013.

The State's proof at trial showed that at approximately 8:45 a.m. on August 17, 2010, Ms. Clemmons and her fiancé, Mr. Wheeler, were eating breakfast in their apartment when Ms. Clemmons heard a knock on the front door. She asked who was there and heard a male respond, "Big Daddy." Ms. Clemmons replied, "Big Daddy who?" Having received no response, Ms. Clemmons looked through the blinds and the front door's peephole and saw no one. She then opened the front door and a large man forced his way into the apartment. Neither Ms. Clemmons nor Mr. Wheeler had ever seen the man before, and Ms. Clemmons described the man as "big" and "[t]all" with a dark complexion and wearing eyeglasses with black frames, a blue hat, a white t-shirt, and blue jogging pants. The man was brandishing a large firearm, which Ms. Clemmons described as black and approximately 12 inches long with a blue laser.

The intruder pushed Ms. Clemmons and Mr. Wheeler back into the apartment and stated, "'[B]****, where's the m*****f****** dope, where's the kilo, where's the money, and where's the children. Where they at? Bring they a** out.'" Ms. Clemmons insisted that she and Mr. Wheeler were the only people in the apartment, but the intruder accused her of lying and hit Mr. Wheeler in the back of the head with the handgun. The intruder dragged Mr. Wheeler into the apartment's bathroom and hit him twice more with the handgun. A second man, whom Ms. Clemmons identified in court as the defendant, then entered the apartment. Ms. Clemmons recognized the defendant, who was wearing a brown hat and who she described as "short." She testified that he was from her aunt's neighborhood and that she knew him only as "Kokomo." Shortly after he entered the apartment, the defendant pulled his shirt up over his nose and mouth to conceal his face.

The first intruder then forced Ms. Clemmons into the bathroom and demanded to know where "the dope and the money at." Ms. Clemmons insisted that she had nothing but an unemployment check, and Mr. Wheeler told the intruders to take their Plymouth automobile. The intruder then repeatedly hit Ms. Clemmons over the head with the handgun. Meanwhile, Ms. Clemmons could hear the defendant ransacking her bedroom and speaking in a strange, unidentifiable accent.

The intruder demanded that Ms. Clemmons remove her clothing and lie down on the floor next to Mr. Wheeler, who had a pillowcase over his head. The intruder told Ms. Clemmons not to talk, and he left the bathroom. Ms. Clemmons told Mr. Wheeler "that's Kokomo in there." The intruder reentered the bathroom and said "'b****, didn't I tell you not to say nothing. I ought to kill you.'" The intruder then proceeded to urinate on Ms. Clemmons' face. The intruder told Mr. Wheeler to hug Ms. Clemmons and instructed Ms. Clemmons to count to one hundred. Mr. Wheeler eventually got up to check the apartment and discovered that the men had left. Ms. Clemmons rapidly dressed and found her apartment manager, who contacted the police.

Ms. Clemmons later discovered that her flat-screen television, her son's computer, and a cordless telephone were missing from her apartment.

After law enforcement officers arrived, Ms. Clemmons and Mr. Wheeler were transported by ambulance to the hospital. Ms. Clemmons' injuries required four staples in her head, and Mr. Wheeler needed five to six stitches in his head. After Ms. Clemmons and Mr. Wheeler returned home, Mr. Wheeler's mother and brother cleaned the apartment and discovered a hat in the bedroom that Ms. Clemmons had seen the defendant wearing during the home invasion. Ms. Clemmons delivered the hat to the police department.

On August 19, Ms. Clemmons went to the Memphis Police Department ("MPD") and viewed a photographic lineup, from which she identified the defendant as the second man who entered her apartment. Approximately one week later, the defendant called Ms. Clemmons and instructed her not to press charges against him.

On cross-examination, Ms. Clemmons admitted that, prior to the home invasion, she had seen the defendant "just two or three times." Ms. Clemmons and Mr. Wheeler both denied that they had ever purchased drugs from or used drugs with the defendant. Ms. Clemmons acknowledged that the defendant's mother had contacted her three to four times following the home invasion and that she eventually visited Ms. Clemmons at her home and asked Ms. Clemmons and Mr. Wheeler to sign documents. According to Ms. Clemmons, she had consumed "about three" glasses of wine at the time, and she and Mr. Wheeler both signed the documents without reading them so that the defendant's mother would "stop bothering her." Ms. Clemmons acknowledged that the documents, both entititled "Sworn Affidavit," stated that the defendant was not involved in the home invasion, but Ms. Clemmons denied that a notary was present when she signed the documents and insisted that the documents were notarized at a later date outside of her presence. Ms. Clemmons conceded that she had missed a prior court date for the trial in the instant case because someone dressed all in black with an obscured face had knocked on her door and frightened her.

Charles Glen Willis with Mack Pest Control was working at Ms. Clemmons' apartment complex on August 17 when he noticed three African-American men walking rapidly out of an apartment. One of the three men, the largest of the three, was carrying something under his arm inside a bag or pillowcase. Mr. Willis saw the three men get into a brown vehicle with "rust on the hood" and flee from the scene. Mr. Willis was unable to identify the defendant as one of the three men he saw that day.

MPD Officer Newton Morgan responded to the scene of the home invasion on August 17. The victims had already been transported to the hospital when Officer

Morgan arrived, and he photographed the scene. Through Officer Morgan's testimony, the State introduced into evidence photographs of the victims' apartment, which depicted several rooms in complete disarray and showed a significant amount of blood on the floor of the apartment. Officer Morgan attempted to obtain fingerprints from the scene but was unsuccessful.

MPD Sergeant Joseph Johnson spoke with the victims at the hospital on August 17. Ms. Clemmons gave Sergeant Johnson "the street name" of Kokomo, and Sergeant Johnson's investigation revealed that Kokomo was the defendant's street name. Sergeant Johnson then prepared a photographic lineup, from which Ms. Clemmons positively identified the defendant as one of the intruders in the home invasion. Sergeant Johnson confirmed that Ms. Clemmons had provided him with a hat that had been found in her apartment following the August 17 incident. On cross-examination, Sergeant Johnson admitted that he did not request any deoxyribonucleic acid ("DNA") testing on the hat and explained that he felt it unnecessary because Ms. Clemmons had already identified the defendant as the perpetrator who had worn the hat.

Through the testimomy of Officer Juaquatta Harris with the Shelby County Sheriff's Department, the State introduced into evidence audio recordings of telephone calls the defendant placed from jail.

With this evidence, the State rested. Following the denial of the defendant's motion for judgments of acquittal, the defendant elected to present proof.

Donna Guy testified that the defendant was her former boyfriend and that she had known Ms. Clemmons all of her life because Ms. Guy's father had previously dated Ms. Clemmons' sister. According to Ms. Guy, Ms. Clemmons had frequently socialized with both Ms. Guy and the defendant at Ms. Clemmons' apartment and that the trio had used drugs together in the past. Ms. Guy insisted that she and the defendant had spent the night at Ms. Clemmons' apartment "[t]hree nights a week for six months," but she could not recall "per se how [the apartment] look[ed]."

Following a *Momon* colloquy, the defendant elected not to testify.

Based on this evidence, the jury convicted the defendant as charged of the aggravated robbery of Ms. Clemmons, the aggravated assault of Mr. Wheeler, the aggravated burglary of Ms. Clemmons' residence, and employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court found the defendant to be a career offender and imposed a 30-year sentence for the aggravated robbery, to be served at 100 percent based on the defendant's prior aggravated robbery conviction. The court imposed a 15-year sentence for the aggravated assault conviction,

to be served consecutively to the 30-year sentence.  With respect to the convictions of aggravated burglary and employing a firearm during the commission of a dangerous felony, the trial court imposed consecutive sentences of 15 years each and ordered that those two sentences be served concurrently with the sentences for aggravated robbery and aggravated assault, for an effective sentence of 45 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.  In this appeal, the defendant contends that the trial court erred by denying his motion to dismiss for failure to prosecute and by improperly instructing the jury on criminal responsibility, that the evidence adduced at trial was insufficient to sustain his convictions, and that the trial court erred by classifying him as a career offender for sentencing purposes.  We will address each issue in turn.

## I.  Failure to Prosecute

The defendant first contends that the trial court erred by denying his oral motion to dismiss for failure to prosecute, which the defendant allegedly made on August 27, 2013, when Ms. Clemmons and Mr. Wheeler failed to appear for the start of trial. According to the defendant, the trial court denied the motion, granted the State a continuance, and subpoenaed the victims to appear.  The case then proceeded to trial in December 2013, less than four months later.

The record on appeal, however, is utterly devoid of the defendant's motion to dismiss, the trial court's order denying the same, or a transcript of the August 27, 2013 court proceedings, rendering a meaningful review of this issue impossible.  The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b).  If the appellant fails to prepare an adequate record, this court must presume the trial court's ruling was correct.  *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

Moreover, the defendant's argument on this issue contains no citation to authority or references to the record.  "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on").  Because the petitioner failed to comply with these rules, he has waived our consideration of this issue.

## II.  *Jury Instruction on Criminal Responsibility*

The defendant next contends that the trial court erred by "failing to include complete instruction to the jury regarding criminal responsibility."  The defendant failed to raise an objection to this jury instruction in his motion for new trial or his amended motion for new trial.  *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989).  "Issues raised for the first time on appeal are considered waived."  *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996); *see also* Tenn. R. App. P. 36(b); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); *State v. Rhoden*, 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987).  Because he raises this issue for the first time on appeal, it is waived.  In any event, the criminal responsibility instruction provided by the trial court tracked the language of the pattern jury instruction and was a correct statement of the law.

## III.  *Sufficiency*

Next, the defendant argues that the evidence adduced at trial was insufficient to support his convictions.  We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Id.*  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.

*Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

Aggravated assault is an intentional or knowing "assault as defined in § 39-13-101(a)(1)" that is committed via the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(B). Assault, as is relevant to this case, occurs when one "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

Aggravated burglary is "burglary of a habitation," T.C.A. § 39-14-403(a), and "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony." *Id.* § 39-14-402(a)(1).

As charged in count four of the indictment, "it is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). Aggravated burglary is one of the enumerated dangerous felonies contemplated by this statute. *See* T.C.A. § 39-17-1324(i)(1)(H).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

In the instant case, the proof at trial established that the assailant known only as "Big Daddy" forcibly entered Ms. Clemmons' residence on August 17, 2010, by use of a firearm and with the intent to rob her of drugs and money. Big Daddy beat Mr. Wheeler over the head with the firearm numerous times, and Big Daddy, who brandished the firearm throughout the home invasion, robbed Ms. Clemmons of a television, a computer, and a telephone. Shortly after Big Daddy forced his way into the residence, the defendant entered, and Ms. Clemmons immediately recognized him. While Big Daddy was holding the victims in the bathroom at gunpoint, Ms. Clemmons could hear the defendant ransacking her bedroom while attempting to disguise his voice. Ms. Clemmons positively identified the defendant from a photographic lineup a few days after the incident.

Viewing this evidence in the light most favorable to the prosecution, we find the evidence adduced at trial more than sufficiently established that the defendant assisted Big Daddy in the commission of these offenses and was thus criminally responsible for Big Daddy's actions. As such, the defendant is guilty of aggravated robbery, aggravated assault, aggravated burglary, and employing a firearm during the commission of a dangerous felony.

## IV. Sentencing

Finally, the defendant contends that the trial court erred by classifying him as a career offender for sentencing purposes. Again, we disagree.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (stating that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review"). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). The supreme court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (quoting T.C.A. § 40-35-210(e)). Under the holding in Bise, "[a] sentence should be upheld so long as it is within the

appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

In the instant case, the jury convicted the defendant of aggravated robbery, a Class B felony, and aggravated assault, aggravated burglary, and employing a firearm during the commission of a dangerous felony, all Class C felonies. The presentence investigation report established that the defendant had three prior Class B felony convictions of aggravated robbery, one prior Class C felony conviction of aggravated assault, and one prior Class C felony drug conviction. In addition, the defendant had four convictions of the Class B felony of attempted especially aggravated kidnapping, three convictions of aggravated robbery, one conviction of the Class C felony of attempted aggravated robbery, and one Class B felony conviction of attempted second degree murder, all arising out of incidents that occurred on August 14, 1995. Tennessee Code Annotated section 40-35-108 provides that a career offender includes a defendant "who has received . . . [a]ny combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony." T.C.A. § 40-35-108(a)(1).

The defendant urges this court to consider the convictions that arose out of the August 14, 1995 incident as a single conviction pursuant to the 24-hour merger rule. *See* T.C.A. § 40-35-108(a)(4). This, however, avails the defendant nothing because, even if we treat these nine Class B and C felony convictions as a single conviction, the defendant still has six qualifying prior Class B and C felony convictions, which clearly classify him as a career offender. Consequently, the trial court did not err by finding the defendant to be a career offender. Moreover, because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of these within-range sentences.

*V. Correction of Clerical Error*

Although not raised by either party, we detect an error that requires correction in the judgment for the conviction of employing a firearm during the commission of a dangerous felony. Based on the transcript of the sentencing hearing and the defendant's criminal history, it is clear that the defendant must serve the mandatory minimum sentence of 10 years for this conviction. *See* T.C.A. § 39-17-1324(h)(2). In the judgment form, however, the trial court, in the "Mandatory Minimum Sentence Length" section, merely placed a check mark on the line by "Employment of Firearm" where the number of years of minimum service should have been. Accordingly, on remand, the trial court shall enter an amended judgment to reflect the mandatory minimum sentence length of 10 years.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court but remand for correction of the employing a firearm judgment as outlined in this opinion.

_____
JAMES CURWOOD WITT, JR., JUDGE